# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

|                                                                                                              |     |                         |
|--------------------------------------------------------------------------------------------------------------|-----|-------------------------|
| J.M., a minor, by and through her parents and next friends, THOMAS and REBECCA MORRIS,                        | )   |                         |
|                                                                                                              | )   |                         |
| Plaintiff,                                                                                                   | )   |                         |
|                                                                                                              | )   |                         |
| V.                                                                                                           | )   | Case No. CIV 07-367-JHP |
|                                                                                                              | )   |                         |
| HILLDALE INDEPENDENT SCHOOL DISTRICT NO. I-29 OF MUSKOGEE COUNTY, OKLAHOMA a/k/a HILLDALE PUBLIC SCHOOLS, and BRIAN GIACOMO, | )   |                         |
|                                                                                                              | )   |                         |
| Defendants.                                                                                                  | )   |                         |

## OPINION AND ORDER

Now before the Court is the defendant, Hilldale Independent School District No. I-29 of Muskogee County, Oklahoma a/k/a Hilldale Public School's ("the School District"), Motion for Summary Judgment, Plaintiff's Response, and Defendant's Reply to said motion. Plaintiffs, Thomas and Rebecca Morris, bring this action on behalf of their daughter, J.M., for violation of her rights under federal and state law. Plaintiffs claim violations pursuant to the Fourteenth Amendment of the United States Constitution, and more specifically 42 U.S.C. §1983 and 20 U.S.C. §1681 (Title IX of the Education Amendments of 1972). Plaintiffs also assert a pendant state law claim against the School District based on its negligent supervision of one of its teachers, the defendant, Brian Giacomo ("Giacomo"). Plaintiffs' state law claim is asserted pursuant to the Oklahoma Governmental Tort Claims Act. Okla. Stat. tit. 51 §151 et seq.

Plaintiffs seek actual damages from the School District, and actual and punitive damages from Giacomo.[1]

## **DISCUSSION**

In general, summary judgment is proper where the pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id. at 249.*

In considering a motion for summary judgment, this court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1310 (10th Cir. 2006).* Furthermore, if on any part of the prima facie case there is insufficient evidence to require submission of the case to the jury, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).* In addition, one of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex* Corp. v. Catrett, *477 U.S. 317,323-24 (1986).* The nonmovant, however, must still identify sufficient evidence requiring submission to the jury to survive summary judgment. *Piercy v. Maketa, 480 F.3d 1192, 1197 (10th Cir. 2007).*

---

[1] Giacomo has not filed a summary judgment motion.

BACKGROUND[2]

J.M, a fourteen year old student, attended Hilldale Public Schools from August, 2005,

through December 2006.  Hilldale is an educational institution that receives funding from the

State of Oklahoma and the federal government.  During the 2005-2006 and the beginning of the

2006-2007 school years the defendant, Giacomo was J.M.'s band teacher.

While employed by the Hilldale School District as a band teacher, Giacomo established

improper relationships with two students, J.M. and S.R.[3]  It is undisputed that Giacomo's

improper conduct with J.M. included vaginal intercourse, anal sex, oral sex, kissing, hugging and

touching.  Plaintiff contends the improper conduct began in December 2005.  Giacomo admitted

in deposition testimony that he recognized J.M. had low self-esteem and that he could take

advantage of her through his position of authority.  Giacomo testified he cultivated an

inappropriate sexual relationship with J.M. by telling her she was beautiful, helping her with her

musical skills, showing her special favoritism, including giving her awards, and making her a

---

[2] The Court notes the School District's objection to Ex. 14 attached to Plaintiff's
Response to Defendant's Motion for Summary Judgment.  Exhibit 14 is an affidavit which was
subscribed and sworn to by Giacomo on February 21, 2008.  Based on Plaintiff's counsel's, as
well as Giacomo's counsel's representations to this Court during the Pretrial Conference,
Giacomo's reaffirmation of the affidavit during his March 20, 2008, deposition, as well as
representations of counsel in the Response filed to the School District's Motion in Limine
(Dkt.#127), the Court overrules the School District's objection and request that this Court find
Exhibit 14 a sham affidavit. Giacomo will be present at trial and the affidavit may be used by the
School District for impeachment purposes, if appropriate.

[3] S.R. has brought a separate civil action against the Hilldale School District and
Giacomo in the United States District Court for the Eastern District of Oklahoma, CIV-07-355-
KEW.  CIV-07-355-KEW is currently on appeal to the Tenth Circuit Court of Appeals in regard
to an Order granting summary judgment in favor of the Hilldale School District.  The case is
stayed in regard to the defendant, Giacomo.

section leader in the band.

Giacomo admits that he engaged in inappropriate sexual touching with J.M. beginning in December of 2005. By January 12, 2006, Giacomo and J.M. regularly exchanged back rubs on school property. The following instances of conduct are undisputed by the parties: (1) Giacomo kissed J.M. for the first time on April 6, 2006; (2) Giacomo and J.M. had oral sex for the first time on April 21, 2006, and intercourse for the first time on or about April 25, 2006; (3) Giacomo and J.M. had sex after school in the band room, and in Giacomo's office; (4) Giacomo and J.M. had sex in Giacomo's home and in J.M's home, and (5) Giacomo and J.M. had oral sex in Giacomo's vehicle. It is further undisputed that Giacomo regularly pulled J.M. from her other classes to have sex in the band room. Although Defendant claims "[a]ll of the sexual contact between J.M. and Giacomo was consensual," (Defendant's Motion for Summary Judgment; undisputed fact no. 6), Plaintiff disputes this assertion and responds that this is a "shameful and inappropriate assertion. A fourteen-year-old girl cannot 'consent' to sex with an adult teacher." (Plaintiff's Response to Summary Judgment at 3). [4] Further, J.M. testified Giacomo told her to keep their sexual relationship a secret.

---

[4] The Court finds this argument is in violation of Fed.R.Civ.P. 11. A person under the age of sixteen is incapable of giving legal consent. *See Lee v. State, 122 P. 1111 (Okla.Crim. 1912)*. Pursuant to Okla. Stat. tit. 21, section 1114 rape in the first degree is defined by the following act: "[r]ape committed by a person over eighteen (18) years of age upon a person under the age of fourteen (14) years . . ." "In all other cases, rape or rape by instrumentation is rape in the second degree." *See also, Okla. Stat. tit. 21, section 1111(8).* Further, Oklahoma case law establishes "consent to the act or acts of sexual intercourse will not constitute a defense to a civil action to recover damages [by the victim] for an assault upon her committed in such a manner and under such circumstances as to constitute rape." *Watson v. Taylor, 131 P. 922 (1913).* "Most courts that have considered the consent defense in civil actions arising out of statutory rape have excluded the defense." *4 ALTA's Litigating Tort Cases, section 54:48 n. 13 (June 2007).*

In April of 2006, Giacomo took J.M. and a number of other students to St. Louis on a school sponsored band trip. After the students arrived at their hotel, band student M.P., went to Giacomo's room to ask him when they were going to leave for dinner.[5] M.P. testified that Giacomo opened the previously closed door, and M.P. saw J.M. lying on Giacomo's bed, wearing no shoes. Plaintiff alleges that later on the same trip, a group of students again saw J.M. alone in Giacomo's hotel room. It violated the School District's policy for a band teacher to be alone in a hotel room with a student on a band trip. M.P. also testified that Giacomo hugged J.M. every day during the band trip.

J.M. testified that she and Giacomo did not have sex while they were in St. Louis. J.M. also testified that she went to Giacomo's room to 'hang out' and that other students were also present in his room from time to time for the same reason. J.M. testified that the door to Giacomo's hotel room was always wide open when she was in his room, and other students could just walk in.

Near the end of the 2005-2006 school year, Giacomo gave J.M. an award as one of the most improved band students. After the awards ceremony, M.P. called J.M. a "slut" and said the only reason she received the award was because of her "pedophile boyfriend." M.P. testified he told J.M. she needed to separate from her "pedophile boyfriend." J.M. later told Giacomo what M.P. had said.

Giacomo testified that he then related to the assistant high school principal, Darren Riddle ("Riddle"), what M.P. had said to J.M. and arranged a meeting between the parties. In

---

[5] M.P. was the boyfriend of S.R. during this time frame. The School District also contends S.R. and J.M. disliked each other and were rivals in the band program.

that initial meeting, M.P. told Riddle that Giacomo was a pedophile. It is disputed as to whether M.P. also discussed J.M.'s presence in Giacomo's hotel room at this initial meeting. M.P. testified that when he attempted to inform Riddle of Giacomo's misconduct, Riddle scared M.P. and became angry, paced rapidly, had an angry tone, raised his voice and appeared infuriated. Giacomo testified that during this meeting, Riddle "shut [M.P.] down and yelled at him." Giacomo also testified Riddle instructed M.P. to stop spreading "rumors" because M.P. could ruin Giacomo's career, and that Riddle did not want to deal with the "mess" that could result from those "rumors." Riddle testified that M.P. recanted his allegations shortly after making them.

M.P. testified that approximately three weeks after this meeting, Riddle pulled him out of class and threatened to suspend him if the rumors about Giacomo did not stop. M.P. explained to Riddle that Giacomo had a student alone in his room on the band trip to St. Louis, that he had "seen them hugging a lot," and that he "thought things were going on between them." M.P. also advised Riddle that the situation between Giacomo and the student "needs to be looked at." M.P. testified that Riddle did not ask the name of the student who was involved with Giacomo, but instead became even more furious than he had been at the first meeting and threatened to suspend M.P. Riddle disputes the fact that this second meeting ever occurred.

There is no dispute that a meeting did in fact occur between M.P.'s parents and Riddle. Riddle testified he contacted M.P.'s parents to discuss M.P.'s allegations. M.P. testified this meeting took place between the first and second meetings M.P. had with Riddle. There is a dispute as to who was present during this meeting. Giacomo claims he was again present during this meeting with M.P.'s parents, while the School Board disputes Giacomo attended. Ted

Hebert, M.P.'s father, testified Pemberton was present during this meeting (Ted Hebert depos. at 30). Pemberton, however, testified he did not participate in this meeting and knew nothing about it (Pemberton depos. at 45). Giacomo testified that, during this meeting, Riddle encouraged M.P.'s parents to keep their son quiet about the sexual misconduct between Giacomo and J.M. Giacomo further testified that M.P.'s parents also reported they had heard rumors that Giacomo was a pedophile. In fact, Giacomo testified that his misconduct with J.M. was known to other teachers and Riddle based upon Giacomo's behavior at school. Giacomo concludes that, while he went to great lengths to keep anyone from finding out about his relationships with J.M. and S.R., his own conduct, including pulling J.M. out of classes several times each week for sexual encounters, indicated that he was doing something he should not have been doing.

In August of 2006, Giacomo began the inappropriate relationship with S.R. Between August and September, S.R. and Giacomo engaged in kissing, hugging, and touching. It is undisputed they did not engage in oral sex or have sexual intercourse.

On November 9, 2006, S.R.'s mother obtained the password to S.R's MySpace internet site and discovered messages between S.R. and Giacomo that suggested they were engaged in an inappropriate relationship. S.R.'s mother printed off some of the messages, and S.R.'s mother and father met with the high school principal, Gary Dewayne Pemberton ("Pemberton"), and Riddle that afternoon to show them the messages.

Pemberton called D.B. Merrill ("Merrill"), the Superintendent of Hilldale School District, and told him about the meeting with S.R.'s parents. Merrill authorized Pemberton to suspend Giacomo immediately, which Pemberton did the same day.

On the morning of November 10, 2006, Merrill met with Pemberton and Riddle and

ordered them to begin an investigation into the allegations. This investigation included speaking with J.M. for the first time concerning her relationship with Giacomo. When questioned, J.M. denied such a relationship. She testified later that she had promised Giacomo that she would not tell anyone about their relationship.

M.P. testified that by the end of the 2005-2006 school year, when he first reported the allegations to Riddle, it was "really obvious" to persons at school that Giacomo and J.M. had an inappropriate relationship. S.R. testified that another student, W.M., had referred to Giacomo as a "pedophile" who was sleeping with his students after seeing Giacomo in the hotel room on the St. Louis band trip (S.R. depos. at 130-31, 133). M.P. testified that during that time period it was common knowledge among the band students that Giacomo and J.M. had a sexual relationship. M.P. further testified that J.M. would sit on Giacomo's lap in Giacomo's office in front of other students, and that band students knew that Giacomo and J.M. were meeting on school grounds after school. M.P. testified that in March of 2006, some students heard noises from Giacomo's office which sounded like Giacomo and J.M. were inside having sex. Giacomo testified he spent a great deal of time with J.M. and that Riddle was aware that Giacomo and J.M. walked the halls together. Pemberton testified that when the investigation took place in November of 2006, many students did in fact report knowledge of a relationship between J.M. and Giacomo.

Further, the November 2006 investigation revealed that Giacomo and J.M. had communicated on the internet using MySpace, MSN and Xanga, which sometimes involved Giacomo's use of school computers. Additionally, the investigation revealed that in the Spring 2006 semester, Giacomo had kept topless photographs of J.M. on his computer.

On the afternoon of November 10, 2006, Merrill met with Giacomo and gave Giacomo a

letter formally notifying him that he was suspended. Giacomo then submitted an unconditional resignation that was effective immediately. Law enforcement was also notified on November 10, 2006. On March 3, 2008, Giacomo entered guilty pleas in Muskogee and Custer Counties to numerous felony charges arising from his conduct with J.M. and S.R.

The School District did not have a written policy that prohibited sexual relationships between teachers and students, including minor students, but it did have a policy prohibiting sexual harassment which it published to employees and students. The record is unclear in regard to the policy concerning the duty to investigate allegations of sexual abuse.

### Title IX

Title IX provides in pertinent part that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a). Title IX encompasses sexual harassment of a student by a teacher and is enforceable through an implied private right of action for damages against a school district. *Franklin v. Gwinnett County Public School*, 503 U.S. 60, 75-76 (1992).

Pursuant to Title IX, liability may be imposed on an educational institution such as the Hilldale School District for a teacher's sexual harassment of a student only if a school official has actual notice of the misconduct and acts with deliberate indifference in failing to respond to the situation. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). *See also Morse v. Regents of University of Colorado*, 154 F.3d 1124 (10th Cir. 1998); *Bostic v. Smyrna School District*, 418 F.3d 355, 360 (3d Cir. 2005).

According to the record, the facts are disputed in regard to both of these issues. The School District claims it cannot be liable under Title IX because no appropriate school official

had knowledge of Giacomo's actions and the School District did not act with deliberate indifference once Merrill and the School Board were notified. Plaintiff claims, however, the School District was notified of Giacomo's conduct by one of J.M.'s fellow students on two separate occasions. Further, Plaintiff claims the School District was deliberately indifferent once it was notified because not only did the School District not conduct an investigation, the School District disbelieved the reporting student, M.P, and threatened him with suspension. Further, Plaintiff contends M.P. was denied a transfer to the School District by the superintendent, upon the recommendation of Riddle and/or Pemberton following the report of sexual abuse.

The School District first argues that neither Riddle or Pemberton were appropriate persons for the purpose of establishing actual notice of a Title IX violation. The School District argues that the only proper parties to receive notice of a Title IX violation are the superintendent, in this case Merrill, and/or the board of education. Plaintiff argues this is contrary to Tenth Circuit case law, Title IX, and the customs and policies adopted the School District.

In _Gesber v. Lago Vista Independent School District, 524 U.S. 274 (1998)_, the United States Supreme Court explained that Title IX conditions an offer of federal funding "on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of federal funds." _Id. at 286._ The Court explained that the contractual nature of Title IX prohibits the imposition of liability based on principles of constructive notice or respondeat superior; in order to be liable, the funding recipient must be actually aware of discrimination in its programs and fail to remedy such discrimination. _Id. at 287-88._ The Court therefore concluded that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute

10

corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's program and fails to adequately respond." *Id. at 290 (emphasis added).* The Court also emphasized that to be actionable, "the response must amount to deliberate indifference to discrimination . . . The premise, in other words, is an official decision by the recipient not to remedy the violation." *Id.*

The School Board argues that under Oklahoma law, only the superintendent and the local board of education may take employment action against a teacher citing Okla. Stat. tit. 70, §§ 6-101.25 and 6-101.29 (2001). The School Board argues that only these persons have the authority to fire, transfer, or suspend teachers. This Court finds, however, that the *Gesber* Court did not hold liability must be predicated upon actual notice to the school board or superintendent. *Gesber* also does not define "appropriate person" to mean a person who can fire, transfer, or suspend the harasser. *Gesber* defines that term to include any official with authority to impose "corrective measures," or in other words, any official with authority do something to stop the misconduct.

Case law supports the proposition that on-site school administrators, such as principals and assistant principals, qualify as "appropriate persons" in Title IX cases. As was explained in *Warren v. Reading School District, 278 F.3d 163, 169-70 (3d Cir. 2002)*, the *Gesber* Court itself assumed that a school principal was an "appropriate person":

> Although the [Gesber ] Court itself did not explicitly state whether a school principal can be an "official" or "appropriate person" under Title IX, we think it is obvious from the Court's discussion that knowledge of a principal can be sufficient in an appropriate case. The only official with information about the teacher's misconduct in Gesber was the principal. The Court examined his actual knowledge and concluded that it was not sufficient for liability under Title IX, Gesber, 524 U.S. at 291-92, 118 S.Ct. 1989. The Court's analysis

> in <u>Gesber</u> rested upon the supposition that a principal is usually high
> enough up the bureaucratic ladder to justify basing Title IX liability
> on his or her actual knowledge and deliberate indifference. If a
> principal is not "an appropriate person" for purposes of Title IX,
> a substantial portion of the Supreme Court's analysis is <u>Gesber</u> was
> nothing more than a meaningless discussion.

The *Warrren* Court also recognized that the "practical result" of requiring notice to a school board would be to "undermine the private cause of action under Title IX . . . .[and] eliminate the protection Congress intended for students . . ." *Id. at 170.* Under the School District's analysis, school administrators would have an incentive and motivation to conceal harassment from school boards to eliminate liability.

Additionally, in *Murrell v. School District No. 1, 186 F.3d 1238, 1243-47 (10ᵗʰ Cir. 1999),* the Tenth Circuit ruled that persons who were designated by school policies to "receive such complaints" are "appropriate persons," including "teacher[s], guidance counselors and vice principals. . . "[6] In *Montgomery v. Independent School District No. 709, 109 F.Supp.2d 1081, 1099 (D.Minn. 2000),* the court concluded that, where a sexual harassment policy imposes upon teachers a duty to convey reports of sexual harassment to the school principals, teachers became "appropriate persons" with authority to take "at least this minimal corrective measure which, if effectively carried out, would impart knowledge of the harassment to higher School District officials with even greater authority to act."

In the instant case, Plaintiff contends Riddle received a report from M.P. in May of 2006 that: (1) Giacomo was a pedophile; (2) Giacomo had violated school policy by being alone in a hotel room with a student; (3) Giacomo was openly hugging a female student, and (4) M.P.

---

[6] The School Board argues *Murrell* is distinguishable because it involved student on student harassment rather than teacher on student harassment. This Court finds this distinction irrelevant in regard to "an appropriate person" analysis.

suggested that the matter needed to be investigated. The record further demonstrates that Riddle related M.P.'s allegations about Giacomo to Pemberton. There is a factual dispute as to whether Pemberton attended the meeting between Riddle and M.P.'s parents.

There is an additional question of fact as to when the Superintendent, Merrill learned of M.P.'s allegations, due to Riddle's and/or Pemberton's successful effort to remove M.P. from the transfer list. When Riddle first notified Pemberton of M.P.'s allegations in May of 2006, Pemberton told Riddle "you know the way to get rid of him . . . put him on your list and go talk to Merrill . . . Mr. Merrill is the only one who can deny transfer students (Pemberton depos. at 43-44). The record is unclear as to when Riddle and/or Pemberton approached Merrill to request denial of M.P.'s transfer. It is undisputed that Merrill had ultimate authority to grant or deny transfers, and that M.P.'s transfer was denied.

The Court finds these persons were authorized to take remedial action. The Student Handbook designated Riddle, Pemberton, and Merrill as persons to whom harassment reports were to be made and by whom they would be investigated. Superintendent Merrill agrees that he delegated the responsibility to investigate harassment to school level principals, such as Riddle and Pemberton (Merrill depos. at 13, 44-45). Riddle, however, testified it was Merrill's duty to investigate (Riddle depos. at 83), while Pemberton testified it was Riddle's duty to investigate (Pemberton depos. at 43-44, 62-64). Pemberton testified he relied solely on Riddle's investigation of the matter.

Regardless, it is undisputed that upon the initial report by M.P. in May of 2006, neither Riddle, Pemberton, nor Merrill conducted an investigation into the allegations of M.P. in spite of the fact they had the authority, ability and duty to institute corrective measures to stop the abuse.

Accordingly, the Court finds Riddle, Pemberton and Merrill were all "appropriate persons" pursuant to Title IX to have received the reports of sexual abuse of a student.

The School District also argues that even if Pemberton and Riddle were "appropriate persons," M.P.'s statements regarding the St.Louis trip did not establish actual notice because it was reasonable for Riddle to believe M.P. recanted his story. In the context of Title IX claims, courts universally recognize that "actual notice" exists where a school has information indicating a "substantial danger" to students. *See Bostic v. Smyrna School District, 418 F.3d 355, 360-61 (3d Cir. 2005); Folkes v. N.Y. College of Osteopathic Medicine of N.Y. Institute of Technology, 214 F.Supp.2d 273, 284-85 (E.D.N.Y. 2002).* However, the actual notice standard "does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student. At some point . . . a supervisor school official knows . . . that a school employee is a substantial risk to sexually abuse children . . ." *Gordon v. Ottumwa Community School District, 115 F.Supp.2d 1077, 1082 (S.D. Iowa 2000).*

The *Gordon* court recognized that evidence of a single, uncorroborated report of inappropriate touching of a female student created a jury question regarding "actual notice." *Id*. That outcome is consistent with the general rule that even uncorroborated complaints about a teacher that the teacher denies creates a jury question about whether the school district was on notice of a substantial risk to students. *Doe v. Green, 298 F.Supp.2d 1025, 1034 (D.Nev. 2004) quoting with approval (Hart v. Paint, 2002 WL 31951264).* Actual notice can be established, for example, by reports of inappropriate physical conduct with a student and rumors of a teacher's sexual activities with students. *See Doe v. School Administrative Dist. No. 19, 66 F.Supp 57, 63 (D.Me. 1999).*

The Court finds Plaintiff has established a question for the trier of fact as to the issue of "actual notice."   M.P. testified he told Riddle that Giacomo: (1) was a pedophile; (2) was seen in a hotel room alone with a female student, in violation of the School District's policy, and (3) was seen hugging a student.  In fact, M.P. testified he told Riddle that he needed to investigate "because he thought things were going on between them." (M.P. depos. at 20).  Riddle admits that he was aware of these allegations by M.P., but M.P. recanted his story.  Pemberton agrees that allegations that Giacomo was a "pedophile"  — standing alone  ---- warranted a "full-blown" investigation.   The School District's argument that there was no notice because Riddle testified M.P. recanted his story establishes a question of fact for the jury. The contention that M.P. recanted his story is based solely on the deposition testimony of Riddle himself, which could be construed as a self-serving statement.  The jury may well believe either that M.P. did not recant his allegations, or that he recanted his story due to threats of suspension.  The record does establish M.P. was ultimately denied a transfer back into the school district to finish his last two years of high school.  Further, Giacomo testified he was present during the initial meeting between M.P. and Riddle, and does not agree with Riddle's assertion that M.P. recanted his story.

Finally, the School District argues that it was not deliberately indifferent after it received actual notice on November 9, 2006, when Pemberton called Merrill and reported his conversation with S.R.'s parents.  At that time an investigation took place which ultimately lead to Giacomo's suspension and resignation, as well as criminal charges.  The Court finds, however, there remains a question of fact as to whether the School District was deliberately indifferent when M.P. first reported the allegations of abuse in May of 2006.  Title IX "does not

require specific responses [but] it does require a reasonable response once a school receives actual notice of a substantial risk. *Vance v. Spencer County Public School District, 231 F.3d 253, 262 (6th Cir. 2000).* Often, the minimum required response to avoid "deliberate indifference" is for the school to conduct a legitimate investigation.

Construing the record and reasonable inferences therefrom in the light most favorable to Plaintiff, a trier of fact could find that Riddle and Pemberton had "actual notice" much earlier than November 9, 2006, and conducted no investigation at all. Further, it appears from the record an earlier investigation in May of 2006 would have elicited the same findings the latter investigation revealed, and would have prevented the sexual abuse of J.M for several months.[7] Therefore, the Court finds there remains a question of fact in regard to whether the School District exhibited deliberate indifference.

**Section 1983**

In order to establish a claim under 42 U.S.C. §1983, a plaintiff must prove a deprivation of a constitutional right by someone acting under color of state law. *See A. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).* In suits against a governmental entity, it is not enough for plaintiff to show the deprivation of a constitutional right by an agent or employee of the governmental unit. Rather, a civil rights plaintiff must identify an official policy or custom of the government that causes the deprivation of a constitutional right. The causal link between the policy and the deprivation must be readily apparent; all that is needed is a statement of the policy and its enforcement. *See City of Springfield v. Kibbe, 107 S.Ct. 1114, 1119 (1987).* Thus,

---

[7] Plaintiff contends Giacomo and J.M. had sexual relations more than fifty times on school premises and that Giacomo sexually harassed J.M. every school day between M.P.'s first report of abuse in May of 2006 and the time Giacomo ultimately submitted his resignation.

municipal liability, requires that Plaintiff establish a deprivation occasioned through the enforcement of an official policy, procedure, custom or usage. *See Monnell v. Dept. of Social Ser's of New York City, 436 U.S. 658, 690 (1978).*

In *Monnell*, the United States Supreme Court made clear that municipal liability under Section 1983 cannot be premised on theories of respondeat superior. As noted above, the constitutional deprivation must result from the application of an official policy or practice of the governmental entity. As a result, a school district can be liable under §1983 when its failure to follow procedures to investigate sexual harassment becomes so widespread as to become a custom. *Murrell, 186 F.3d at 1249-50.* Liability arises under *Monnell* when a school district adopts procedures or customs that are indifferent to the risk that students will be molested by teachers or students. *See City of Canton v. Harris, 489 U.S. 378, 388-89 (1989).*

In the instant case, the record demonstrates that: (1) the School District's written policy regarding Sexual Harassment required Merrill to investigate all sexual harassment complaints and prepare a report; (2) Merrill's practice was to delegate this duty to building level principals, and (3) those principals had no training, and no practice of investigating. Moreover, as referenced *supra*, Riddle testified that it was Merrill's responsibility to investigate (Riddle depos. at 83). Merrill testified that it was Pemberton's and Riddle's responsibility to investigate (Merrill depos. at 13, 44-45), and Pemberton testified that it was Riddle's duty to investigate (Pemberton depos. at 43-44, 62-64). Accordingly, a trier of fact could determine the practice and custom was that ultimately, there was no one in charge of investigating complaints of sexual abuse. Therefore, there remains a question of fact as to whether the School District's practices and customs were the moving force that led to J.M.'s injuries.

The Supreme Court further refined its *Monnell* decision in *Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)*, by holding that in order to affix liability to a municipality under §1983, the alleged unconstitutional acts must be committed by an official possessing final policymaking authority with respect to the alleged acts.  Further, *Pembaur* made clear that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances...because even a single decision by such a body unquestionably constitutes an act of official government policy."  *Id.*

Contrary to Plaintiff's argument, however, the Court finds Giacomo was not designated by the School District as a policymaker.  Although the record demonstrates that Merrill admits he delegated all authority regarding the band program to Giacomo[8], Merrill did not delegate policymaking authority to Giacomo on behalf of the School District.

## OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT

Plaintiff has also asserted state law claims pursuant to the Oklahoma Governmental Tort Claims Act ("GTCA"), *Okla. Stat. tit. 151, et seq.*  The GTCA contains a broad waiver of sovereign immunity, providing that a political subdivision, such as the School District, "shall be liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment . . .  where the political subdivision, if a private . . . entity, would be liable for money damages under the laws of this state." *Id. §153.*  The School District argues it has no tort

---

[8] The record does reveal Giacomo was not supervised by anyone in the creation and implementation of band policies.  Giacomo admits that he exercised his authority to create a "policy of sex" within the Hilldale band program.  When asked why he molested J.M., Giacomo testified that, "I just felt I had the power, I could do it if I wanted to."

liability because Giacomo's misconduct with J.M. falls outside the GTCA's definition of "scope of his employment." The Court finds, however, the School District may be liable for its own torts in the same manner as any other employer.[9]

"The Act makes major policy statements by generally waiving immunity and removing the cloak protecting public funds from tort liability. The general waiver is not an infinite blue sky." *Nguyen v. Oklahoma*, 788 P.2d 962, 964 (Okla. 1990). " The scope of liability is limited in §153 of the Act to torts committed within the scope of employment where private persons or entities would be liable under the laws of this state and is subject to other limitations and exceptions specified in the Act. Thirty carefully enumerated exemptions from liability are provided in the Act. Subparagraph five is the discretionary function exemption." *Id*.

Section 155(5) gives governmental entities immunity from liability for injuries resulting from "[p]erformance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees." "The discretionary function exemption from governmental tort liability is extremely limited." *Robinson v. City of Bartlesville Board of Education*, 700 P.2d 1013 (Okla. 1985). " This is so because a broad interpretation would completely eradicate the government's general waiver of immunity. Almost all acts of government employees involve some element of choice and judgment and would thus result in immunity if the discretionary exemption is not narrowly construed." *Nguyen*, 788 P.2d at 964. "Just as the waiver is not a blue sky of limitless liability, the discretionary exemption is not a black hole enveloping the waiver." *Id*.

---

[9] The School District does not address its own liability in either the Summary Judgment Motion, or the Reply.

In order to obtain immunity under §155(5), the particular act sought to be immunized must be both discretionary and involve a policy choice. "The majority approach under the Federal Tort Claims Act ("FTCA") and similar state acts is the planning-operational approach," which was developed in _Dulehite v. United States, 346 U.S. 15 (1953)_ and has subsequently been followed by federal and state jurisdictions. _Id_. Under this approach

> once a discretionary policy decision has been made, government
> employees have a duty to execute the policy on the operational
> level without negligence. Moreover, the general rule under the
> planning-operational test is that the discretion is exhausted by the
> initial adoption of policy, and that decisions to apply broad policy
> in specific cases are operational decisions. Thus, under this
> approach the government retains its immunity with respect to
> formulation of policy, but it is subject to liability for routine
> decisions and daily implementation of the policy or planning
> level decision."

_Id_. at 965. "In recognition of the constitutional principle of separation of powers, the discretionary function exception was intended to prevent the use of tort actions to second-guess what are essentially executive or legislative decisions involving social, political, economic, scientific, or professional policies or some mixture of these policies." _United States v. Gaubert, 499 U.S._ In light of these principles, the Court construes §155(5) to prevent the use of tort actions to challenge policy but not necessarily to prevent challenging the School District's conduct in implementing policy.

**Failure to Report**

Teachers and other school officials and personnel have a legal obligation to report suspected child abuse to the Department of Human Services. Okla. Stat. tit. 10, §7103 (A)(1)(d) requires **every person "having reason to believe** that a child under the age of eighteen (18)

years is a victim of abuse or neglect," to report it "promptly to the Department of Human Services." (emphasis added). Section 7103 (A)(1)(c) <u>specifically places this obligation on all</u> <u>"teacher(s) of any child under the age of eighteen (18) years."</u> (emphasis added). A "person who knowingly and willfully fails to promptly report any incident as provided in this section may be reported by the Department of Human Services to local law enforcement for criminal investigation and, upon conviction thereof, shall be guilty of a misdemeanor." Okla. Stat. tit. 10, § 7103 (A)(5)(c) .

The term "having reason to believe" . . . a child is a victim of abuse, as set forth in Okla.Stat. tit. 10, §7103 does not vest school personnel with the discretion to determine whether such abuse actually occurred.

> Once school personnel suspect or should suspect that a child may be sexually abused, they are divested of any discretion to determine . . . whether the abuse actually occurred. If school personnel were allowed to determine whether reasonable cause existed or whether such abuse actually occurred before reporting the matter to [DHS], the goal of protecting children from sexual abuse would be undermined. Although the school board may initially investigate the credibility of any rumors of sexual abuse, whether there was reasonable cause to report the allegations is an objective determination. For purposes of the Reporting Act, the issue of whether school personnel have reasonable cause to report suspected allegations of abuse is determined by the objective belief of a reasonable person, not the school board's subjective belief.

*Id*. at 297. Further, as with any other negligence claim, civil damage liability for failing to report complaints of child sexual abuse will only arise when it proximately causes injury to another." *Doe v. Coffee County Board of Education, 852 S.W.2d 899, 909 (1993).*

In the instant case, there remain questions of fact in regard to whether Riddle, Pemberton

or Merrill, after an initial investigation in May of 2006, had or should have had, reasonable cause to suspect abuse, and therefore had a duty to report the allegations. Once the School District, through Riddle, Pemberton or Merrill, was informed that its employee may have abused a female student, the School District had constructive knowledge of such abuse. *Doe v. Dimovski, 783 N.E.2d 193, 199 (Ill. 2003)*. At that point, pursuant to Oklahoma statutory law, the School District had a duty to report the abuse to the Department of Human Services. Given the Reporting Act's mandatory language, the School District was divested of the exercise of discretion and the determination of policy based on the failure to report. Therefore, the Court finds the School District is not immunized under §155(5) for Plaintiff's claim based on its failure to report.

## NEGLIGENT SUPERVISION

Plaintiff also claims the School District is liable under the GTCA for its negligent supervision of Giacomo. As stated supra, while §155(5) applies to discretionary functions including policymaking and planning decisions, the exemption does not apply to negligent performance of policy. As the court noted in *Doe v. Cedar Rapids Community School District, 652. N.W.2d 439, 445 (2002)*:

> The choices inherent in hiring, retaining, and supervising a particular teacher are not policy choices our legislature intended to immunize. They do not affect the "big picture" but rather have impact on a very small scale. These decisions must be made by every school district when a teaching position is vacant and must be filled. Such decisions are no different than a government employee's decision to turn left or right at a stop sign. Actions of this nature are not immune from liability because they are not real policy decisions implicating governmental functions.

Although there is no Oklahoma case directly on point, the Court in _Cooper v. Millwood Independent School District_, _887 P.2d 1370 (Okla. App. 1994),_ found the petition validly stated a claim against the school district for negligent supervision and recognized a duty on the part of the school district to keep the plaintiff student safe from danger.   Although the defendant argued it had no legal duty to a student to prevent injury from another student, the court found otherwise.  The court found that "[w]hen a special relationship between the parties exists and when the occurrence of harm or damage to one party is foreseeable, a legal duty to control the actions of third persons will be found." _Id_.  citing _Wofford v. Eastern State Hospital, 795 P.2d 516, 519 (Okla. 1990)._  "Other Courts have imposed liability on a school when foreseeable acts of third parties cause harm to students in the school's care. _Id_. citing _Kansas State Bank and Trust Co. v. Specialized Transportation Services, Inc._, _819 P.2d 587 (199;  Randell v. Tulsa Independent School District No. 1, 889 P.2d 1264 (1994)_

"Based upon this special relationship between a school and its students, claims against a school district based on its own negligence may be pursued.  The negligence claim before us is no different from the judgments of private individuals which are reviewed every day through the mechanism of an action in tort.  Personal injury from . . . the negligence of those into whose care [children] are entrusted is not a risk that school children should, as [a] matter of public policy, be required to run in return for the benefit of a public education.  Applying traditional tort principles, the courts are perfectly capable of adjudicating the reasonableness of hiring, retaining, and supervising a particular teacher." _Id_.  Because the discretionary function immunity does not apply to this claim, summary judgment as to this cause of action is denied.

Accordingly, Defendant's Motion for Summary Judgment is denied.

IT IS SO ORDERED this 25th day of July, 2008.

James H. Payne
United States District Judge
Eastern District of Oklahoma